DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**H.S., THE FATHER,**
Petitioner,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES** and **STATEWIDE GUARDIAN AD LITEM OFFICE,**
Respondents.

No. 4D2023-1825

[April 3, 2024]

Petition for Writ of Prohibition to the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Yael Gamm, Judge; L.T. Case No. 2016-5433CJDP.

Antony P. Ryan, Regional Counsel, and Richard G. Bartmon, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, 4th District, West Palm Beach, for Petitioner H.S., the Father.

Carolyn A. Schwarz, Appellate Counsel, Children's Legal Services, Fort Lauderdale, for Respondent Department of Children and Families.

Sara Elizabeth Goldfarb, Statewide Director of Appeals, and Sarah Todd Weitz, Senior Attorney, Appellate Division, Statewide Guardian ad Litem Office, Tallahassee, for Respondent Statewide Guardian ad Litem Office.

No appearance for the Mother.

No appearance for Attorney ad Litem on behalf of the Child.

ARTAU, J.

The right of parents to direct the upbringing and the moral or religious training of their children is older than our constitutional form of government and deeply rooted in our common law traditions. H.S., the father—who is a Christian minister and youth pastor—lawfully opposes, on moral and religious grounds, gender transition before adulthood for his minor child—who is a biological male.

We are asked in this case to determine whether the father reasonably feared that he would not receive a fair hearing on the appropriate placement for his child based on remarks the trial judge made suggesting she had predetermined that the father had no right to oppose gender transition or otherwise direct the child's upbringing based upon his moral and religious beliefs.

The father argues that he has a reasonable fear that he will not receive a fair hearing because the trial judge "has demonstrated a bias against [him] and a disregard for the requirements of the law."

We agree with the father and grant his petition for a writ of prohibition.

## Background

In 2016, the child was removed from the mother's custody because of her substance abuse issues. The child was adjudicated dependent as to the mother. Because the father was not an offending parent, the child was not adjudicated dependent as to the father. In October 2017, the mother complied with a dependency case plan and achieved reunification with the child.

In April 2023, the child ran away from the mother and went to stay with a family friend after the mother had relapsed and had been verbally, emotionally, and physically abusive. The child reported that the mother would drink multiple bottles of alcohol a day and would drive while intoxicated. The mother also gave the child sex-reassignment hormones that she had bought on the internet without a lawful prescription.

At some point after running away, the child moved in with the father. Because of his moral and religious beliefs, the father refused to seek any sex-reassignment treatment for the child and opposed any form of gender transition before adulthood.

In June 2023, the Department of Children and Families ("DCF") moved for an emergency modification of placement for the child. In its motion, DCF sought to remove the child from the custody of both the mother and the nonoffending father. The only grounds that DCF provided for why the child should be removed from the father's custody were that the father was "emotionally abusive" toward the child because the father "doesn't understand [the child's] way of life" and does not allow the child to live and dress as a female or pursue gender transition.

However, the child has never been adjudicated dependent as to the

father, and there have never been any findings that the father has abused, abandoned, or neglected the child. Moreover, DCF filed a notice it was not seeking any adverse supplemental findings against the father.

Nonetheless, the trial judge granted DCF's motion and removed the child from the custody of both the mother and the father. Despite his status as a nonoffending parent, the trial judge removed the child from the father's custody because the father "seem[ed] to be unaware[] [and] unaccepting of [the child's] current emotional situation and ensuing needs" based on the father's opposition to gender transition for the child before adulthood.

Following the trial judge's ruling, the father moved for the child to be returned to his custody on the grounds that it is unlawful to infringe on parental rights in the absence of any findings of actual or prospective abuse, abandonment, or neglect.

The day before the hearing was scheduled on the father's motion, the trial judge conducted an in-camera interview with the child. Instead of using the child's legal name during the interview, the trial judge referred to the child by female pseudonyms, as well as "sister" and "young lady."[1]

During one interaction, the trial judge referred to the child by Female Name 1, and remarked that the child was "one smart, strong[,] [t]ogether, young lady[.]"

After the child complained to the trial judge that the father uses "his beliefs and use[s] his religion[] to" oppose the child's gender transition, the trial judge asked the child if the father "has the potential to change to be more tolerant[,] [m]ore accepting[,]" if she were to put "some, like, professional help, like counseling and guidance and things that the department [DCF] could put into place[.]" In doing so, the trial judge essentially told the child that she could order the father to submit to "professional help," "counseling," or "guidance" from DCF as a way to change the father's moral or religious beliefs.

Later during the interview, the child told the trial judge that rather than being called by Female Name 1, the child instead wanted to be called by Female Name 2. In response, the trial judge agreed that she would recognize the child's name request and instructed the child "to update

---

[1] To protect the identity of the child, we have generically referred to the female pseudonyms attributed to the child as "Female Name 1" and "Female Name 2" in this opinion.

3

your Zoom name, next time you log in, okay?"[2]  And as a parting remark, the trial judge also told the child: "Chin up, sister."

On the following day, the father moved to disqualify the trial judge.  The trial judge promptly entered a written order denying the motion to disqualify as "legally insufficient."  The trial judge then conducted a hearing on the father's motion to return the child to his custody, but reserved ruling on his motion.

Thereafter, the father petitioned here for a writ of prohibition to disqualify the trial judge.

## Analysis

"[T]he standard of review of a trial judge's determination on a motion to disqualify is de novo."  *Dunlevy v. State*, 201 So. 3d 733, 735 (Fla. 4th DCA 2016) (quoting *Stein v. State*, 995 So. 2d 329, 334 (Fla. 2008)).

A party may move to disqualify a trial judge if "the party reasonably fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge[.]"  Fla. R. Gen. Prac. & Jud. Admin. 2.330(e)(1).  "The requirement of judicial impartiality is at the core of our" judicial system.  *Parr v. State*, 247 So. 3d 550, 555 (Fla. 4th DCA 2018) (quoting *McFadden v. State*, 732 So. 2d 1180, 1184 (Fla. 4th DCA 1999)).  Thus, a party is entitled to the disqualification of the trial judge if the party has "a well[-]grounded fear that he [or she] will not receive a fair trial at the hands of the judge."  *Wargo v. Wargo*, 669 So. 2d 1123, 1124 (Fla. 4th DCA 1996) (quoting *State ex rel. Brown v. Dewell*, 179 So. 695, 697-98 (Fla. 1938)).

Whether the party's fear is well-grounded "is a question of what feeling resides in the affiant's mind and the basis for such feeling."  *Livingston v. State*, 441 So. 2d 1083, 1087 (Fla. 1983) (quoting *Dewell*, 179 So. at 697-98).  To answer this question, "[a] determination must be made as to whether the facts alleged would place a reasonably prudent person in fear of not receiving a fair and impartial trial."  *Id.*  "If the attested facts supporting the suggestion are reasonably sufficient to create such a fear,

---

[2] The record does not reflect that either parent was served with notice or had previously consented to legally change the child's name.  *See* § 68.07(7)–(8), Fla. Stat. (2023) (providing that a court may legally change a minor's name only if both parents consent or one parent consents and the other receives notice by service of process).

4

it is not for the trial judge to say that it is not there." *Id.* (quoting *State ex rel. Davis v. Parks*, 194 So. 613, 614 (Fla. 1939)).

Here, the father's fear that he cannot receive a fair and impartial hearing before the trial judge is well-grounded and objectively reasonable.

"Children do not belong equally to parents and the state[.]" Debbie Maken, *Aligning Appellate Standards of Review to Match the Constitutional Liberty Interests Implicated in a Termination of Parental Rights Proceeding*, 98 Fla. Bar J. 22, 24 (2024). Rather, "their protection is first entrusted to the parents, extended family next, and then, if necessary, the state." *Id.* However, government action that substitutes its views or beliefs on childrearing for that of the parent demonstrates a "zeal" for "paternalism." *Id.* "That zeal going unchecked by a judiciary, far from protectionism, abnegates the child's reciprocal right not to lose a parent unnecessarily." *Id.*

Our common law recognizes that the relationship between a parent and his or her child is "the most universal in nature," inclusive of the right of a parent to direct his or her child's upbringing. *See* 1 William Blackstone, *Commentaries on the Laws of England* *446, *452-53 (1753); *see also* Hugh C. Phillips, Note, *Liberating Liberty: How the Glucksberg Test Can Solve the Supreme Court's Confusing Jurisprudence on Parental Rights*, 16 Liberty U.L. Rev. 345, 363 (2022) ("Historically, . . . . [t]he family unit was the most important association in life and therefore the foundation, not only of civil society, but of government itself. This view of the family created a high regard for parental rights in the common law.").

These rights still exist today because they have not been abrogated by statute. *See* § 2.01, Fla. Stat. (2023) ("The common . . . laws of England . . . [until July 4, 1776,] are declared to be of force in this state; provided the said statutes and common law be not inconsistent with the Constitution and laws of the United States and the acts of the Legislature of this state.").

Indeed, our Legislature has codified these rights. Section 1014.04(1), Florida Statutes (2023), provides that "[a]ll parental rights are reserved to the parent of a minor child in this state without obstruction or interference from the state[.]" Among these rights are a parent's "right to direct the upbringing and the moral or religious training of his or her minor child." § 1014.04(1)(b), Fla. Stat. (2023). Recognizing the common law rights of a parent, our Legislature expressly provided that "[a] parent of a minor child in this state has inalienable rights that are more comprehensive than those listed in this section[.]" § 1014.04(4), Fla. Stat. (2023).

Therefore, the father has a right under the common law and section 1014.04(1)(b) to rely upon his moral or religious beliefs to direct his child's upbringing. Nothing requires that the father's moral or religious beliefs be aligned with those of the child as a condition of parenthood.

The father also has a lawful right to refuse to allow the child to seek any treatment furthering the child's gender transition before adulthood. *See* § 1014.04(1)(e), Fla. Stat. (2023) (granting a parent "[t]he right to make health care decisions for his or her minor child, unless otherwise prohibited by law."). Moreover, the father's opposition not only to gender transition before adulthood, but also to any form of sex-reassignment treatment, is not prohibited by Florida law. Rather, preventing the child from undergoing any form of sex-reassignment treatment is consistent with Florida law, which prohibits minors from undergoing such treatment. *See* § 456.52(1), Fla. Stat. (2023) ("Sex-reassignment prescriptions and procedures are prohibited for patients younger than 18 years of age," except in limited circumstances.).[3]

To an objectively reasonable person, the trial judge's pre-hearing remarks were antagonistic to the father and his right to direct the child's upbringing and moral or religious training. Those remarks when taken together—referring to the child by female pseudonyms, telling the child that "you are one smart, strong[,] [t]ogether, young lady," and to "[c]hin up, sister"—implied a foregone conclusion, before hearing the father's motion, that the trial judge was supportive of the child's gender transition before adulthood and opposed to the father's reliance upon his moral or religious beliefs to otherwise direct the child's upbringing.

Furthermore, the trial judge's in-camera interaction with the child went beyond mere attempts to establish a rapport with the child. Before hearing the father's motion to return the child to his custody, the trial judge explained to the child what would happen if she permanently removed the child from the father's custody contrary to the "placement priority" provided by section 39.4021(2)(a)(1.), Florida Statutes (2023), requiring

---

[3] A minor may continue to undergo sex-reassignment treatment if the treatment began and was ongoing on May 17, 2023, and the minor had a prescription to undergo such treatment. § 456.52(1)(a)–(b), Fla. Stat. (2023). However, pursuant to this exception, a minor is permitted to extend treatments for up to six months from the effective date of the accompanying rule only if the minor had a pre-existing prescription. Fla. Admin. Code R. 64B8ER23-3 (2023). Thus, because the child here never had a lawful prescription for sex-reassignment treatment, the child is prohibited by section 456.52(1) from undergoing such treatment, and in any case, the six-month exception has already elapsed.

that the trial judge first consider placing the child with the "[n]onoffending" parent before considering any other placement. Then, the trial judge verbally expressed an inclination—again, before hearing the father's motion—to order the father to submit to "professional help," "counseling," or "guidance" from DCF in an effort to change his moral or religious beliefs.

The trial judge's statements exhibited that she had predetermined that the father's moral or religious beliefs needed to be adjusted before he was fit to serve as the child's custodial parent despite "[t]he [father's] right to direct the upbringing and the moral or religious training of" the child as expressly provided by section 1014.04(1)(b), and recognized at common law.

Thus, to an objectively reasonable person, it would appear that the trial judge had prejudged the case before hearing the father's motion such that she would not rule in the father's favor, regardless of the legal merits. This constitutes sufficient legal grounds for the trial judge's disqualification. *See Wargo*, 669 So. 2d at 1125 (explaining that a party is entitled to the disqualification of a trial judge if the judge makes "gratuitous remarks which were disparaging of [a party's] position . . . . [when] the remarks may have signaled a predisposition, rather than an impression formed after reviewing the evidence"); *Dumas v. State*, 331 So. 3d 307, 308 (Fla. 5th DCA 2021) ("While a judge may form mental impressions and opinions during the course of hearing evidence, he or she may not, as it appears the presiding judge did here, prejudge the case."); *see also Parks*, 194 So. at 615 ("[E]very litigant is entitled to nothing less than the cold neutrality of an impartial judge.").

**Conclusion**

Therefore, the father's fear that he cannot receive a fair hearing before the trial judge is well-grounded and objectively reasonable. Accordingly, we grant the father's petition for a writ of prohibition, quash the trial judge's order denying his motion to recuse, and direct the trial judge not to exercise further jurisdiction over these proceedings. On remand, the case is to proceed before a different trial judge.

*Petition for writ of prohibition granted; case remanded with instructions.*

KLINGENSMITH, C.J., concurs.

MAY, J., dissents with opinion.

7

MAY, J., dissenting.

I have no quarrel with the majority's reliance on the age-old and long-recognized parental right "to direct his or her child's upbringing." I also have no quarrel with the majority's reliance on Florida's statutory protection of that right. In fact, I have no quarrel with any of the law and principles espoused by the majority. I simply disagree with the majority's application of the law to the facts and its conclusion.

Here, the trial judge's attempt to speak with a child in a manner that put the child at ease does not demonstrate the judge's predisposition of the pending issue. In fact, trial judges often take special care to speak with children to ensure they are comfortable in court proceedings; the decision to do so is within a trial judge's discretion. *See* Leigh Goodmark, *From Property to Personhood: What the Legal System Should Do for Children in Family Violence Cases,* 102 W. Va. L. Rev. 237, 307–15 (1999) (stating a trial judge has discretion in how to handle and prepare a child for being in a courtroom).

To me, the trial judge simply attempted to relate to the child on the child's terms and to explain the legal process and options available. This was completely appropriate for the trial judge to do. The trial judge did not exhibit a pretermination that "the father's moral or religious beliefs needed to be adjusted before he was fit to serve as the child's custodial parent . . . ."

"The question of disqualification focuses on those matters from which a litigant may *reasonably* question a judge's *impartiality* . . . ." *MacKenzie v. Super Kids Bargain Store, Inc.,* 565 So. 2d 1332, 1334 (Fla. 1990) (emphasis added) (citation omitted). "[T]o decide whether the motion is legally sufficient, a determination must be made as to whether the facts alleged would place a *reasonably* prudent person in fear of not receiving a *fair and impartial trial.*" *Id.* at 1334–35 (emphasis added) (citation omitted) (internal quotation marks and brackets omitted).

Despite the majority's description of what occurred, the trial judge's remarks were neither "antagonistic to the father and his right to direct the child's upbringing and moral or religious training" nor did they express an "inclination to order the father to submit to 'professional help,' 'counseling,' or 'guidance' from DCF in an effort to change his moral or religious beliefs." The trial judge made NO statement indicating how she would rule on the case.

8

As the First District held in *Brown v. Pate*, "Judge Pate's expression of 'grave concern' over possible visitation cannot serve as a basis for disqualification. A judge may form mental impressions and opinions during the course of presentation of evidence so long as she does not prejudge the case." 577 So. 2d 645, 647 (Fla. 1st DCA 1991) (citation omitted). Thus, I disagree there was any implied forgone conclusion the trial judge was "supportive of the child's gender transition before adulthood and opposed to the father's reliance upon his moral or religious beliefs to otherwise direct the child's upbringing."

I would deny the petition.

*       *       *

**Not final until disposition of timely filed motion for rehearing.**